The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit, are admonished to draw an eye and give their attention. For the Court is now sitting. God save the United States and this Honorable Court. Please be seated. All right, we're prepared to take on our first case. Mr. Fulton, whenever you're ready, sir, we'd be pleased to hear from you. Thank you. Good morning, Your Honors. May it please the Court. We have reserved five minutes for rebuttal. My name is Ross Fulton. I represent Malcolm Wiener, who was awarded $8 million in damages by a jury for AXA's negligence. When we were here two years ago in this matter, before this Court, the opinion in Wiener 1 reversed the District Court's post-verdict subject matter jurisdiction dismissal, finding choice of law was waivable and waived. Wiener 1 remanded for a decision on AXA's challenge to the amount of damages, which was neither raised nor briefed in Wiener 1. Importantly, Wiener 1- We reversed, but we did leave the matter of damages to the trial court on remand. Yes, Your Honor. Yes, Your Honor. Remanded on the issue of damages, the amount of damages. But in the opinion in Wiener 1, this Court also rejected AXA's alternative arguments based on the sufficiency of the evidence of Wiener's injury and causation, finding, quote, ample evidence, quote, close quote, to support the jury's verdict, citing testimony that AXA was negligent in falsely reporting to the MIP Clearinghouse that Wiener suffered from four serious medical conditions that he did not have and that Wiener became effectively uninsurable or uninsurable at a reasonable cost as a result of that negligence. This Court found that Sanford Robbins, Mr. Wiener's insurance broker with 37 years of experience, testified he was unable to find a $16 million replacement policy at the standard rate, that Mr. Robbins testified a healthy person of Mr. Wiener's age would obtain a standard rate insurance. This Court cited testimony that six carriers declined coverage altogether, two made preliminary offers of a $10 million policy at double the standard rate, and that Mr. Burgess, citing his testimony, the underwriting and damages expert proffered by Mr. Wiener at the trial, testified that life insurers look at MIP codes early and would be deterred from starting the process for someone with significant MIP codes on their record. Mr. Burgess also testified that at least one MIP code submitted from Mr. Wiener was a deal killer and a hot-button issue that would prevent insurers from issuing policies to Mr. Wiener. Mr. Robbins testified that he was told by an insurer that MIP codes presented an underwriting problem that would prevent the issuance of a standard rate policy to Mr. Wiener. These findings from Wiener 1 are the law of the case. On remand... Can you help me understand why they relate to damages? I'm totally tracking everything you've said, but maybe I'm just missing something. You seem to focus on these a lot in the brief, too. What do they have to do with damages? What it has to do with damages, Your Honor, is that Mr. Robbins cited the amount of the standard rate policy premiums that would cost $400,000 per $10 million in insurance. There was citation to the amount of the replacement policy that Mr. Wiener was seeking but was unable to obtain as a result of access negligence, which was $16 million, so 1.6 times that amount. So the jury had in their hands the amount of the policy that he was seeking to obtain but was unable to obtain as a result of their negligence, except at an unreasonable double the standard rate, perhaps, up rate. They had the amount of the premiums. They had the double the amount of the premiums that it would cost. And so the jury was able to go back and do the math necessary to come to its very reasonable $8 million conclusion. So accepting your premise that we're looking at 8, not 16, I think that's wrong, but I'll accept it for a second. Tell me how that reasonable math happens and maybe focus a little bit on how there was evidence to support 12.5 years of life expectancy. Yes, Your Honor. So first, we don't know exactly what the jury did. No, no, but what we know is they can't pick numbers out of the air. They can't literally just make a number up. That's the whole point of the law of damages. It can't be totally and completely speculative. Correct, Your Honor. It can't be completely speculative. It has to be at least reasonable. And here we believe the jury did act reasonably in coming to its $8 million conclusion. In starting from the $16 million policy that was being sought, which we've cited cases in our brief that the face amount of the insurance policy can be a reasonable maximum amount of damages for the loss of an insurance policy. And then working their way down from there, it was accepted, unrebutted testimony of the expert witness, Stephen Burgess, that the amount of damages would be the $16 million in policy premiums sought as a replacement policy, less the premiums that would be paid on that policy moving forward. The amount of those premiums were known to the jury. Were you aware of that in the J.A.? Yes, Your Honor. Mr. Burgess' testimony on that was at, not at the J.A. site, but at the trial transcript site to pages 328 and 329 of the trial transcript. So he said it is 16 minus the premiums to be paid. And you agree that's right? We agree that's right, Your Honor. So how did he tell us to calculate the premiums to be paid? And so here's where the trial transcript takes an interesting turn because, and this is why I believe $8 million is the correct number. Okay, but tell me where you, get to the answer and then you explain it. Sure. Where does the 12.5 come from other than like a Ouija board or something? At this point, Mr. Wiener had already lived six years since the denial of the premiums at the time of the trial. But that's not a relevant question. The question is, what was his life expectancy in 14? The question that has to be asked by the jury is, what was the damages at the time? Correct. Which requires a probability distribution of his likelihood of death in each year to follow. That's what they needed to do. And the fact that he happened to live six years is irrelevant to his actual damages because you had to look at the life expectancy probability distribution in 14, not in 20 when we happened to be there. Yes, Your Honor. But here we have a 79-year-old plaintiff at the time of the event in 2014, Mr. Wiener. The jury had in front of them ample testimony both from Mr. Wiener and from his primary care physician, Barry Boyd, about his health both at the time in 2014 and at the time of the trial. They had evidence of his health. But you agree his health at the time of the trial doesn't matter. It's his health in 2014. The damages are as of that day, right? The fact that he's alive in 2020 is, like, true, but it doesn't affect what his damages were in 2014 in any way. Under North Carolina law, Your Honor, the jury can make a determination of life expectancy based upon the health, the constitution, the practices, the patterns of. What is the North Carolina law that says with no testimony from any actuarial information, no testimony from an expert about life expectancy, that the jury can just pick a number as to how long they think a given 79-year-old person is going to live? Your Honor, we would cite to Wooten v. Warren by Gilmer, which is 117 North Carolina Appellate 350, 1994, which discusses that the health, constitution, habits, and the like, can be relevant evidence that a jury can rely upon in coming up with life expectancy. They can be relevant evidence, but the jury can't look at a 79-year-old man and estimate how long he's going to live without some evidence. The evidence here was testimony from his primary care physician of over 25 years about his checkups, his practices, about his habits, about his lack of diagnoses of any condition that would affect his life expectancy at the time. And I'll stop. And your testimony is based on that, the doctor saying he's been coming in, he seems like he's fine, that the jury could conclude that in 2014, six years earlier, his life expectancy was 12.5 years, and that that would be a rational decision based on evidence. Yes, Your Honor, as well as Mr. Wiener's testimony himself about his health and his practices, which was the subject of his testimony, which the jury could then see and judge for themselves and decide upon whether they agreed with him or believed him about his health and his constitution and his practices. And here I'd like to go back to the... On the expert testimony here, the opposing side indicates that the expert spoke only in the most general of terms and that the expert lacked any firsthand knowledge of Wiener's actual situation or also his effort to replace the coverage. In other words, the expert testimony, your opponent's side, was simply insufficient to rescue the jury damages award from being purely speculative. What do you do with that, given the fact that the expert spoke only in the most general terms, was unable to... You don't want an expert to become a fact witness, but he didn't have any knowledge of your client's situation. And so his testimony isn't enough to predicate the damages award, is it? Your Honor, his testimony is supported by the testimony of Sandy Robbins, that what Mr. Wiener was attempting to do was find replacement insurance for the $16 million policy that he had lost. And when Mr. Burgess appears and testifies that $16 million was the number and he is their expert on damages, we believe that combined with those two factors in the light most favorable to Mr. Wiener, the jury could reasonably rely upon that testimony. I did want to touch upon an issue regarding the $16 million versus $8 million number at JA 1135. During Mr. Burgess' testimony, there was an objection by AXA to him continuing to testify about the premiums that would be paid on the $16 million policy. Can it be said that the real damage award that the jury came up with and the one that you need to justify is the $16 million rather than the $8 million because the $8 million represented a mitigation effort, but it didn't actually figure into the damage award? Isn't the figure that you need to justify in terms of the reasonable certainty standard, the $16 million? Your Honor, we believe it's the $8 million and it's in the cases that we've cited. Why is it $8 million given the fact that the $8 million seems to be predicated purely on a mitigation? And again, Your Honor, at JA 1135, during the objections to Mr. Burgess' expert testimony about the future premiums... How about I answer that question, right? Because you said the cases... You've given us no case where you have a special verdict form and you have two separate steps of damages and that the court is supposed to ignore the first one and only look at the ultimate conclusion. The cases you've given us don't say that at all by any stretch of imagination. In all the cases we have, say, when we have a special verdict form, we look at each answer, right? Not that we just look at guilty at the end of it or the total damages. If you give a special verdict form, we have to justify each aspect of the verdict. And yes, Your Honor, and again, just getting to this point very quickly, in those objections to Mr. Burgess' testimony, it was characterized by the counsel in arguing with the court that the testimony about the future premiums was being offered in terms of mitigation of damages and the court invited AXA, accepted that characterization, and invited AXA to ask about it on cross with... So it is true that you said it was mitigation, right? But that does not make it mitigation, right? Like, the fact that you, and I don't necessarily mean you personally, but your side said this is mitigation doesn't actually make it mitigation, right? I mean, it doesn't fit under the instructions. It's like a nonsensical idea to think that the premiums that he would have paid had he gotten a policy is somehow mitigation. Your Honor, what we contend is that it's reasonable for the jury to consider that under the mitigation line when the court and counsel acted and characterized the future premiums as mitigation during the course of the trial. If court and counsel are treating it as mitigation during the course of the trial and the jury is there, we believe it's reasonable for the jury to also treat it as mitigation. Wait, so in contrast to the jury instructions, you think the jury should have relied on your lawyer's claim that it's relevant to mitigation and the overruling of the objection, that they should have figured out from the overruling of your colleague's objection that that should govern instead of the jury instructions? Your Honor, it was sustaining Axe's objection, but in doing so we believe that the court was accepting the characterization that these were being offered. The jury was supposed to understand that that overruled the jury instructions that were given to it. That's the argument, that they should have listened to the objection response and not the jury instructions. Your Honor, I see that I'm out of time. Would you like me to? I think Judge Wilkinson will let you answer the question. Go ahead. I just had a brief question. However we characterize the $8 million as mitigation or something else, how would that relieve us from the inquiry of whether the $16 million, that figure was proven with reasonable certainty? We still have to answer the question with regard to the $16 million, do we not? Your Honor, we believe the $16 million was a reasonable starting point based upon the cases we've cited that that is a maximum amount for the loss of an insurance policy. Your Honor, we do believe that the characterization in court in front of the jury that these were for mitigation of damages would make it reasonable for the jury to have done that math on the form in the manner that they did in finding their ultimate conclusion of damages of $8 million. Chiefs, Judge Provencio has a question. Sure. Mr. Fulton, you know, obviously you chose to litigate this case because you're the plaintiff and you chose to seek damages based on rendering him uninsurable or at least insurable at an unreasonable amount. You chose, following up with my dear colleague Judge Richardson's question about what happened at 2014, you didn't ask for the value loss, did you? Because you could, in other words, the question could have been, what is the value of a $16 million insurance that you put $3 million in over 26 years, what is the present day value of that? That wasn't your theory, was it? No, Your Honor. It related to the inability to replace that insurance policy. All right. So then you're left there with, your case would have been then exactly how much that would cost, right? Right. Did you tell the jury what it would cost? That would cost along the $400,000, that was, right? The $400,000 doubled.  That was your theory, right? Yes. Rather than, to me, this should be the case of specific performance, that is, and no, I won't say that, but the question is to put him back where he was, and that is a $16 million policy at a premium, and whatever that premium is above what's unreasonable would be your damage because you have to pay premiums. Did you put that case before the jury, you think? No. What we put in front of the jury and the evidence relating to what happened with the original lapse policy was excluded by the court in this case because it was the subject of a companion case, I guess I will call it, related case in New York. Do you have further questions? That's all. All right. Thank you very much. Thank you, Your Honors. All right. Let's hear from Mr. Sarchak. Mr. Sarchak? Is it possible that if the $16 million is not justified or cannot be proven, does that mean we automatically go to $1 of nominal damages, or is there some in-between number that might be ascertained in a retrial on the grounds that the result of the first trial was against the weight of the evidence? The district court did make an alternative grant of a new trial, and there would obviously be discussions on remand with the district court about the scope of that retrial and how much Mr. Wiener might expand on the evidence presented in the 2020 trial. But in the 2020 trial, which is this morning's focus, there were two key failures of proof. I'm saying can the failure of proof be corrected on a new trial? I'm sorry, Your Honor. Could it be corrected in a new trial? If the district court allows Mr. Wiener to go beyond the evidence he presented in the first trial, he might be able to cure these problems, but some of the problems are ones that call for expert testimony, and that expert testimony wasn't presented here. So the two key failures of proof. Can you help me on just a procedural question to make sure I understand your position? Your position is because there was a judgment entered here, what we're reviewing is the question of whether nominal damages was improper. Right. Because the district court awarded, maybe I'm just misremembering, the district court awarded nominal damages here. Correct, in fulfillment of Rule 50. Right. And so we would have to find that that was in error to get to the alternative ruling that a new trial, or those are alternative grounds that we can reach. I agree. It is an alternative grant under 50C1, so the new trial arises only if the Rule 50 grant is reversed. So I'd like to focus on the two. Only if the district court was in error. On the Rule 50B, or the ruling about damages on remand specifically. So the two key failures of proof I'd like to highlight are, number one, the size of policy or death benefit that Mr. Wiener could have gotten if not for the MIP codes. No witness testified to that. My friend argues that if not for the codes, Mr. Wiener could have gotten a $16 million policy. But no witness said that. Either Mr. Robbins or Mr. Burgess, had they had a basis, perhaps could have said that, but neither one did. Secondly, what would have been the premiums that would have been paid on a new policy? But your position at bottom is relatively simple, and that is, or straightforward, and that is that Mr. Wiener bore the burden of proof with regard to damages, and that he had to prove the damage award with reasonable certainty, and that given some of the difficulties you've enumerated, he did not carry his burden of proving the damage award with reasonable certainty. That's right, Your Honor. I mean, that's what it comes down to ultimately. Yes, and the specific aspect of the proof of damages that wasn't proved with reasonable certainty was the but-for scenario. If the MIP codes had not been in place, what size policy, what premiums would have occurred, the State Supreme Court in North Carolina's opinion in Lee v. Meyer speaks right to this. That was a case in which there was an auto collision, injury was proved, but there was no showing of what the condition of Mrs. Lee's car was before the crash, what its value was, and the like. That's very similar to the circumstances here, where part of the burden Your Honor has identified to show damages with reasonable certainty is to show a baseline, and that was exactly Judge Conrad's ruling, was that there was no baseline, and he particularly focused on the lack of a baseline on the amount, the death benefit of the policy. Well, I guess part of the problem is this is life insurance, and you're dealing with a 79-year-old individual, and the replacement policies such as they are, are going to require a substantially higher premium, and I guess the only concrete evidence you have is that the insurers that were willing to insure this were only willing to do so at a rate that's far greater than a standard rate. Is that right? That is right, Your Honor, and a key premise Mr. Wiener offers here is, again, on the but-for issue, is that in the absence of the MIB codes, he would have qualified for the standard rate. No witness said that. All Mr. Your Honor? No, go ahead. All Mr. Robbins did on page 928 of the joint appendix is to define the standard rate, and it would have been very easy for him to go ahead and say, if not for the codes, Mr. Wiener would have qualified for the standard rate, but neither he nor Mr. Burgess said that. Did you use the MIB codes to, in fact, in your decision not to reinstate his policy after the lapse? Did Equitable rely on them is your question, Your Honor? Yes. No, because the MIB codes were issued in connection with that denial of reinstatement. In other words, they were not preexisting before Mr. Wiener applied for reinstatement in the 2013-2014. So in that process you didn't use any of that misinformation to inform your decision to deny reinstatement. Is that right? That's right, Your Honor, because the MIB codes were actually issued in connection with the denial of reinstatement.  So this coding was just totally after you had made your decision. Totally. Yes. I'm not entirely clear on the timing, but they were definitely connected with each other. And Mr. Wiener's theory of the case is that it is those codes that made him effectively uninsurable, and that was this Court's holding before. That covers causation. That covers injury. But what the Court remanded for is quantification of damages or specifically testing. Your view is that it bottoms out on a question of causation. No, Your Honor. It bottoms out on a question of causation. Strike that. It bottoms out on quantification of damages. That this Court held in the last opinion that there had been a cause of the injury of effective uninsurability, but what are the damages for that? Causation establishes the law of the case when you went back. Yes, causation of his injury. So all we have to do is the quantity. Isn't there evidence that it would be $400,000 for the premiums and those type things that are there? Yes, but that assumes a premise that wasn't established by the evidence, which is that premise being that in the absence of the codes. That's a causation premise. Causation is established. The question is quantifying it. And the quantification is the premiums that he has to pay over and above. So you're bleeding back into it. Causation is established, the law of the case. Your Honor, I think the Lieb decision might say differently. In Lieb, the Court found causation, found the fact of injury, but said the inability of Mrs. Lieb to establish the baseline of what her change in value of the car was a damages problem. Can I ask a related question, but maybe it's not? To back up a little bit at a higher level of generality, wouldn't the net present value of life insurance, anybody who's getting a new life insurance policy today, the net present value of that has to be less than zero. Otherwise, the insurance company wouldn't issue it. There might be other benefits, risk aversion and the like. Why I buy it. But I don't buy it because the net present value is positive. The money I put in, the expected money I put in, can't be less than the expected money I'm going to get out, taking into account my life expectancy. Right, and that's... Taking into account... And so I guess I have a little hard time understanding how the basic theory here works. I understand the New York action, and that's very different. Because he had paid $3 million in over a long time, and there are real damages there. But I don't understand how a new policy under any scenario could create the kind of economic damages we're talking about. By definition, its net present value is less than zero. Your Honor, I think to say by definition might be too strong because there are assumptions that would have to be made. Right, the insurance company, you're right. They could be wrong, or they could be trying to lose money. Right, I guess those are two premises. But using... If we accepted actuarial tables, and maybe we shouldn't, but if we accepted them as broadly accurate, and we accept that the insurance company is doing its level best to make money, the net present value of the policy has to be less than zero. And I get those are two assumptions, but taking those two assumptions... If the insurance company is accurate in the reasoning, what the Garland case from the State Supreme Court says is in a situation of uninsurability, which was the case there, the proper measure of damages is the just value of the policy not available to be insured. That's where Mr. Wiener is arguing for this idea of the death... But I guess what I'm asking you is the just value, from a pure economic perspective, the just value is zero. That doesn't mean its actual value is zero, because it provides some comfort that my family will be taken care of. It spreads out the risk that I might die at an early age where I haven't made enough money, all these sorts of things. There's value to it, but there's not the kind of economic value that we're talking about. Suffice to say that the State Supreme Court in Garland and the other opinions the parties are citing don't get down to that level of economic analysis. What Garland says is take the death benefit, subtract the expected premiums over the lifetime of the insured, and that's the just value. And in footnotes 7 and 8 of my colleague's brief, they adopt that. And the problem for damages here is that the two key, really three key building blocks, as Your Honor has said, are missing. Number one, what would have been the policy in the But-For scenario, the death benefit? Second, what would have been the premiums in that scenario? And third, what would have been the life expectancy? Not one of those points was shown in the 2020 trial in this case. Instead, I'd really highlight Mr. Burgess' testimony on damages on page 1134 of the appendix. Far from arguing for a measure of damages like the one we're discussing so far, he simply said he had a policy with Equitable before. Equitable didn't reinstate it, so he was out the $16 million of death benefit. And then in closing, Mr. Weiner's counsel said, Burgess told you straight. And you don't disagree with that, and I'm not trying to ask you to concede in the New York action, but in the New York action, this same measure of damages might yield a positive net present value because he's been paying premiums for 20 years. If they wrongly, if they should have renewed the policy, I'm not taking a position on it, but had they done so, there might have been a net present value that was positive in that instance, but there's not a net present value that's positive in any new policy. Your Honor, on the suppositions that we've discussed, that's probably right. But that wasn't argued in this case at all, was it? No, for the reason I just said, Your Honor, which is that. Exactly, because in other words, I understand what my friend Richardson is saying, but if that's the case, then you could have all kinds of violations with impunity. He said, well, we could do anything we want to do, not hypothetically. Of course, your company wouldn't do that, or any other company would, but say, well, we did this, and we put all kinds of codes in, but you don't have any damages because, you know, it's going out to get a new policy that has no value. I mean, so it has to have some value to it, and it seemed to me, you know, what they're trying to say is that this is what I had to pay additional premiums to get, trying to get a $16 million policy, and when that should have been calculated, I'm not sure. That's what we have to, we're trying to get help with that, but say it's nominal, it's only nominal, and there's no value at all having established causation, and say there's no damages at all. It's a... Your Honor, it's not necessarily that an omniscient narrator would have come in and said Mr. Wiener had no damages, but Rule 50 looks to the evidence that was presented, and for whatever reason Mr. Wiener made the choice to discuss this measure of the earlier policies. That's one problem, and that's one point that was discussed by Judge Conrad in his opinion. Here in this court, we've gone beyond that in the briefing, and the parties are discussing two alternative measures of damages as part of Mr. Wiener's effort to shore up the verdict, one of which is this notion of net policy value that we're discussing. The other one is a premium delta. Both of those measures of damages are missing a baseline. That was Judge Conrad's point, is what was that but-for death benefit? What was that but-for premium? And neither Mr. Burgess nor Mr. Robbins nor any other witness spoke to those issues. Mr. Wiener is assuming a $16 million death benefit. He is assuming eligibility for the standard rate. How do you say he's assuming it? That's what he had. He had a $16 million death benefit. He had a capital premium rate that he was paying. With those established, the question is, what would it cost him above and beyond that to get where he was? And that's the whole point. Maybe nobody would have done it for any reason, but that's part of the calculus. Now he's back into a market that you forced him into, which was established because of the causation. You put him in this market. It's very difficult for an older person to do that, but that's what you're trying to establish. How much more do I have to pay the premium to try to get back to the death benefit? I mean, it's not rocket science, but it is something that has to be carefully done, but that's what you're trying to get to. It's not speculative as the $16 million in terms of the goal, nor premium, which he was already paying. So if that's the flat line, what's up to the premium to get there? And the fact that he can't get there because he's uninsurable, nobody would do it. You may be right. Maybe there was no miscalculation of the MIB. No one would do it, but that's part of his damages, isn't it? Because you put him into that market. Your Honor, no, that wouldn't be part of his damages because that's the theory of the New York case. We can't try the New York case, can we? I'm sorry, Your Honor? We can't try the New York case. No, certainly not. It's not before us. That's your business. What happens there, I have no concern with that. The case is here, this case. What they were trying to do here is to show what the escalation of the premium was to try to get to the $16 million. Right, Your Honor. But the world in 2014 was that MIB codes were in place. So under Lieb, to decide the incremental damages from the existence of the MIB code, there had to be a baseline established. Judge Conrad said specifically in his 50-59 order on damages, the terms of the 1986 policies are the wrong comparator. Because at the time, those policies lapsed for non-payment of premiums. He was not to trial effect, was he? No, he wasn't. But he was assessing the sufficiency of the evidence on damages as instructed by this court in 2014. One last thought, Your Honor, which is my friend has said Mr. Wiener would have qualified for the standard rate because he testified to his health. That's not the question on what rate he would have qualified for. What Judge Conrad said in the remand hearing was one's own self-assessment of health. That might not be at all what insurers would say. No one, specifically the question is what is the level of health for a 79-year-old person to qualify for the standard rate? No one said that Mr. Wiener's health were sufficient. So, Your Honors, for these reasons as well as what's in the briefing, we'd ask the Court to affirm Judge Conrad's Rule 50 and Rule 59 conclusions on damages. Thank you. Thank you, Your Honors. All right. Thank you. Mr. Fulton, you have some rebuttal time. Thank you, Your Honor. I think we agree with Judge Gregory that really Axe's argument returns to arguing about causation. Page 16, the full paragraph on page 16 of this Court's opinion in Wiener 1 is that Wiener presented evidence that he became effectively uninsurable. Robbins testified about his unsuccessful efforts to obtain a replacement $16 million policy for Wiener at the standard rate, which is the rate the typical person would obtain if they were healthy. Two insurance companies made preliminary revocable offers for a $10 million policy at double the standard rate, which would have cost Wiener an extra $400,000 per year. The jury could properly have concluded from this evidence that Wiener had become effectively uninsurable or uninsurable at a reasonable cost, and we would posit that that same testimony would allow the jury to reasonably calculate the damages that came from that uninsurability. Do you agree that that paragraph doesn't answer the last question you just put? It addressed causation. I totally get it, but it didn't address damages. The Court was very clear. We are not addressing damages. I understand you keep saying that, and maybe I'm just missing why you think that resolves damages when the Court said it does not resolve damages. You might have arguments that you can prevail on damages. I totally understand, but I don't understand why you keep going to that language. I just want to make sure I understand it. Sure. Help me. Yes, Your Honor. It's our position that the jury can take that same data, the $400,000 premiums per $10 million in life insurance, the double rate versus the standard rate, and the $16 million policy replacement policy that was being sought, and could go back and could do the math that allowed it to come out with this $8 million conclusion. Using a life expectancy probability distribution that comes from where? That comes from the jury's observation of Mr. Wiener's testimony, his testimony about his health, his doctor's testimony, five years of medical records they had access to that were an exhibit in the trial and are in the joint appendix. All of that information is after 2014, which is the relevant date. The damages are as of 2014, not 2020. I don't understand how any of that evidence is even remotely relevant. If you had records from 2013, I totally understand their relevance. I don't understand the relevance at all of anything that happens after 2014. I'm sorry, Your Honor. Just to clarify, the five years of medical records were for the period leading up to the decision in 2014, the purpose being to show that he did not have the medical conditions that AXA, in 2014, told the MIB that he did have. Which is the negligence piece. Which is the negligence piece, but it also goes to his health at the time in 2014. At the time of the negligence. From those records, the jury was supposed to conclude that he would live 12.5 years. The jury could reasonably conclude that he could have lived for that period of time, based upon their observations of him, their medical records, the testimony of the doctor about what was happening at the time in 2014, that AXA negligently and falsely reported that he had conditions that he did not have. Your Honor, just to address the $16 million single policy that AXA refers to, replacement policy is a red herring. The original policies have lapsed. There were three separate policies that added up to $16 million. So the fact that there's not a single $16 million policy that was applied for is not remarkable here. Mr. Weiner was seeking to replace that life insurance and had multiple applications out there for large policies. With regard to Your Honor's comment about the net present value of an insurance policy being less than zero, multiple courts have found life insurance policies to be assets that have value to someone who loses them. They totally do, right? And so when you look at cases that address it, but there are policies that were preexisting. So the New York policy, the policy that was cancelled, plainly has a positive, or at least plausibly has a positive net present value. But a new policy does not. And I found no case that says a new life insurance policy has a positive net present value. Well, Your Honor, insurance companies also make money from investing the premiums today and paying out benefits tomorrow, in the future. And so it's not a one-for-one exchange of I'm immediately at a loss by paying new premiums in month one for an insurance policy that has a debt benefit. Because despite what the actuarial tables say, I could get hit by a bus out on the street and I could end up in a positive value situation. We understand expected value is not that, right? Expected value looks at the probability of an event times its cost, right? So, yes, it is true you could die in year one, but we don't calculate the expected value of a contract based on a probability of 1%. Your Honor, I see that I'm out of time. I don't know if the panel... Go ahead if you want to answer Judge Richardson's question. Thank you, Your Honor. Your Honor, again, I think that because life insurance policies do have value per courts, and I think that insurance companies aren't selling something assuming that only the premiums are going to make them money. It's also the investing of those premiums over time that an insurance policy can be a win-win situation, even at the beginning of the policy for both the policy holder and the insurance company. All right. We thank you. We will come down and recounsel, and then we will move into our next case.
judges: J. Harvie Wilkinson III, Roger L. Gregory, Julius N. Richardson